## In re MONROE COMMUNICATIONS CORPORATION, Petitioner.

### No. 87–1152.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1988.

Decided March 4, 1988.

---

Harry F. Cole, with whom Gene A. Bechtel, Washington, D.C., was on the brief, for petitioner.

Sue Ann Preskill, Counsel, F.C.C., with whom Diane S. Killory, General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, D.C., were on the brief, for respondent.

Before STARR and SILBERMAN, Circuit Judges, and HAROLD H. GREENE,[*] Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Monroe Communications Corporation petitions this court to issue a writ of mandamus directing the Federal Communications Commission to act on certain matters relating to a comparative license renewal hearing to which Monroe is a party. The writ of mandamus is available only in exceptional circumstances, and we hold the delay at issue here is not so great as to justify that response. However, the presence of seemingly uncontradicted allegations of bad faith on the part of the FCC lead us to retain jurisdiction of the case pending a final resolution of the comparative proceeding.

## I.

Video 44 has held the license to operate Chicago's UHF television channel 44 since 1970. During that tenure, channel 44 changed from a conventional UHF station broadcasting a variety of public affairs, sports, children's, and religious programming into a subscription television ("STV") service—available during most hours of the day only to those who obtain a decoder to unscramble the over-the-air signal—carrying virtually nothing but entertainment programming. *In re Video 44*, 102 F.C.C. 2d 419, 456–57 (1985) (*"Initial Decision"*). After Video 44 filed an application for renewal of its license, *see* 47 U.S.C. § 307(c) (1982), Monroe, in November of 1982, filed a competing application for the right to operate on Video 44's frequency. The Administrative Law Judge held a comparative renewal hearing on these mutually exclusive applications in December of 1983.

The Administrative Law Judge released the *Initial Decision* a little over a year later, on February 21, 1985. As a threshold matter, the ALJ considered whether STV stations should be subject to the same requirements facing other television broadcast licensees. He concluded that "subscription television licenses [sic] have an obligation to the public that is no less than the obligation of conventional television licensees." *Initial Decision*, 102 F.C.C.2d at 461. The ALJ then held that Video 44's past performance entitled it to no renewal expectancy—that preference accorded incumbent licensees for past programming merit, *see Central Fla. Enter. v. FCC*, 683 F.2d 503, 506 (D.C.Cir.1982), *cert. denied*, 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983). Accordingly, he compared Video 44 and Monroe using the standard criteria applied to new applicants for a license, and determined Monroe to be superior. *Initial Decision*, 102 F.C.C.2d at 462–63.

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

Video 44 filed exceptions to the *Initial Decision* in April 1985. On September 5, 1985, the FCC's Review Board issued a memorandum opinion and order that failed to reach the ultimate issue of license renewal. The Review Board regarded the question of the proper standard for determining the renewal expectancy of STV stations, as opposed to regular broadcast stations, as one of first impression and therefore certified it to the full Commission for consideration. *In re Video 44*, 102 F.C.C.2d 408, 412–13 (1985) (*"Review Board Decision"*). The Review Board also observed that record evidence of Video 44's broadcast of sexually explicit programming during its "adult segment" raised "substantial and material questions of fact ... as to whether Video 44 has telecast material that is obscene." *Id.* at 411. In the hearing before the ALJ, this evidence had been treated as relevant only to the quality of Video 44's service to the public and hence to its renewal expectancy—with Video 44 arguing its programming reflected a sensitivity to community desires. *Id.* at 410. Thus, the Review Board's addition *sua sponte* of the obscenity issue as a separate inquiry necessitated a remand to the ALJ for factual development. *Id.* at 411–12.

Video 44 asked the full Commission to delete the obscenity issue. The Commission directed the ALJ to suspend proceedings and, on April 16, 1986, issued a memorandum opinion addressing both issues. It ruled that STV operators were to be judged by "essentially" the same renewal standards as those applied to a conventional licensee. *In re Video 44*, 103 F.C.C.2d 1204, 1207–08 (1986) (*"First Commission Decision"*). The Commission further held that, although consideration of the obscenity issue was consistent with existing precedent, the FCC should not "attempt to determine in the first instance whether material is obscene, but rather, should defer to local authorities," since the Supreme Court's criteria for obscenity rely on local community standards. *Id.* at 1210. *See generally*

*Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The Commission concluded that it would thenceforth consider allegations of obscenity only if the licensee had been convicted of violating 18 U.S.C. § 1464 (1982) (proscribing the transmission of obscenity or indecency), *First Commission Decision* at 1210–11, and the Commission accordingly deleted the obscenity issue and returned the matter to the Review Board.

On May 19, 1986, Monroe filed with the Commission a petition for reconsideration of that portion of the *First Commission Decision* deleting the obscenity issue. In September of that year the Review Board announced it would hold the matter in abeyance pending Commission action on that petition. In October, pursuant to 47 C.F.R. § 0.362(b) (1986), which allows any party to a proceeding to ask the full Commission to decide a matter on which the Review Board has failed to act within 180 days of the Initial Decision's issue, Monroe moved that the Commission resolve *all* outstanding issues in the proceeding, arguing that the *First Commission Decision* in April, returning the matter to the Review Board, began the 180 day period.

■ In April 1987, despairing of further Commission action, Monroe filed a petition for a writ of mandamus in this court.[1] On January 12, 1988, two days before the cause was argued before us, the Commission issued a second memorandum opinion, reversing its prior blanket refusal to consider allegations of obscenity in the absence of a conviction under 18 U.S.C. § 1464. But the Commission, expressing concern over the need to investigate allegedly obscene broadcasts near the time of transmission and over the danger that a mutually exclusive applicant might "raise allegations of obscenity ... even where no parallel concern exists in the local community," further ruled that it would not consider such allegations for the first time in renewal proceedings.[2] *In re Video 44*, No.

---

1. We have exclusive original jurisdiction over such petitions. *Telecommunications Research*

& *Action Center v. FCC,* 750 F.2d 70, 74–79 (D.C.Cir.1984) (*"TRAC"*).

2. We do not reach Monroe's suggestion at oral

83–575, paras. 14–21 (F.C.C. Jan. 22, 1988). The Commission therefore, in the first affirmative step regarding Video 44's license since the *First Commission Decision* in April of 1986, removed the obscenity issue.[3]

## II.

Mandamus is an extraordinary remedy, warranted only when agency delay is egregious. *See TRAC,* 750 F.2d at 79; *Potomac Elec. Power Co. v. ICC,* 702 F.2d 1026, 1034 (D.C.Cir.1983). Delay is measured by a "rule of reason," informed whenever possible by discernible congressional expectations, respecting the pace at which proceedings should advance. The reasonableness of a delay depends in part on the potential impact of any attempt to accelerate the progress of the matter in question on other agency activities of equal or higher importance, as well as on the nature of the interest involved. *TRAC,* 750 F.2d at 80. Monroe concedes the interests at stake here are commercial, not directly implicating human health and welfare,[4] and acknowledges the need to protect them through the exceptional remedy of mandamus is therefore lessened. *See id.* Monroe nevertheless argues the FCC's progress in this case has been unreasonably slow, pointing both to congressional indications that the renewal process should conclude much more quickly than has this one and to signs that the FCC itself regarded the obscenity issue, on which the proceedings foundered for some time, as a matter of high priority.

▮ Monroe notes first that 47 U.S.C. § 155(d), the FCC's organic statute, establishes as an "objective" the issue of a final decision within six months of the close of the initial hearing; at this writing, the *Initial Decision* is thirty-five months old. With respect to rehearings—perhaps the chief cause of delay here—the Senate Commerce Committee has stated that ninety days "should be clearly sufficient to act on any petition for rehearing." S.REP. No. 576, 87th Cong., 1st Sess. 7 (1961). This reconsideration took twenty months. Finally, the entire renewal proceeding, aimed at awarding a five-year license, 47 U.S.C. § 307(c), has gone on for more than five years.

With respect to the obscenity issue, Monroe points out that, within months of the *First Commission Decision,* the FCC sent letters of inquiry regarding allegations that broadcasters—not convicted under 18 U.S.C. § 1464—had transmitted obscene or indecent material. In April 1987, the Commission issued three memorandum opinions (the *"Indecency Actions,"* reported beginning at 2 F.C.C.2d 2698 (1987)) confirming it *would* investigate such allegations in the first instance. Monroe observes that the FCC represented to this court in a proceeding related to the *Indecency Actions* that various petitions for reconsideration in the *Indecency Actions* could be resolved in five months, argues that the *Indecency Actions* involve the same issue as the petition for reconsideration in this case, and concludes that the FCC has all but admitted that the priority properly accorded Monroe's petition makes twenty months an unreasonable delay.

▮ To be sure, an undesirably large amount of time has passed during this proceeding; the three years of administrative limbo following the *Initial Decision* have benefited neither the parties nor the public.

argument that letters of complaint regarding Video 44 on file with the FCC suffice under this latest decision to retain the obscenity issue in this proceeding.

3. Because Monroe's petition was directed toward resolution of the entire comparative renewal proceeding, *see* Petition for Issuance of Writ of Mandamus at 24, this ruling does not moot the matter before us. *See In re Center for Auto Safety,* 793 F.2d 1346, 1351–53 (D.C.Cir. 1986). Moreover, it is uncertain when the Review Board will be able to consider the *Initial*

*Decision,* for still pending before the Commission is Video 44's petition for reconsideration in another matter, *Subscription Video,* 2 F.C.C.2d 1001 (Feb. 17, 1987), asking that that decision—which could have an impact on the renewal expectancy determination for STV stations—be made retroactive to this proceeding.

4. Monroe does note that broadcast regulation has an impact on public welfare and thus has significance beyond the pecuniary interests of broadcasters.

We cannot, however, call the delay unreasonable on its face. The issue of obscenity is a delicate one, requiring the FCC to balance policy and constitutional concerns; it is to be expected that consideration of such matters will take longer than might rulings on more routine items. Further, we must give agencies great latitude in determining their agendas, *see FCC v. WJR*, 337 U.S. 265, 282–83, 69 S.Ct. 1097, 1106–07, 93 L.Ed. 1353 (1949) (Congress left largely to the FCC's "judgment the determination of the manner of conducting its business"); *Medical Comm. for Human Rights v. SEC*, 432 F.2d 659, 674 (D.C.Cir.1970) (agency's setting of priorities is not a proper subject of judicial inquiry), so the FCC's representation to us that it simply chose to resolve the *Indecency Actions* first, as a prelude to orderly resolution of the obscenity issue in this proceeding, is significant. Most importantly, the proceeding is now moving—albeit with some prodding in the form of Monroe's petition for a writ of mandamus—and counsel for the FCC has assured us that the outstanding issues will be resolved expeditiously.[5]

On the other hand, motion is not necessarily the same thing as progress—as the protagonist of "Charlie on the MTA" well knew—and we are troubled by Monroe's suggestion it is merely being taken for a ride. It alleges that the FCC has acted in bad faith; that it harbors an institutional antipathy toward comparative renewal proceedings that will cause it to delay in any way possible consideration of the transfer of a broadcast license from one holder to another.[6] Monroe argues that the *First Commission Decision* announced a policy essentially unique to the Video 44 proceeding, since the Commission acknowledged it was breaking with precedent and soon thereafter, in the *Indecency Actions*, appeared to reverse itself again and complete

the circle. Such a circuitous progression is not of itself an indication of bad faith on the part of the FCC, especially in the context of such a delicate issue, but neither is it inconsistent with Monroe's charge. If Monroe is correct that it is likely to prevail when the merits of the comparative proceeding are finally reviewed (concerning which, of course, we express no view), the FCC could avoid transfer of the license only by indefinitely postponing that final review. *See Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21, 34 (D.C.Cir.1984) ("agency, by reversing course and issuing an advance notice of proposed rulemaking, 'has embarked on the least responsive course short of inaction' "); *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 340 (D.C.Cir.1980) (agency must at some point decide on basis of knowledge it has, even if knowledge is imperfect). It is the suggestion the FCC is purposely shirking its obligation under the Administrative Procedure Act to avoid unreasonable delay, 5 U.S.C. §§ 553(b), 706(1) (1982)—that it seeks to evade the event it finds undesirable by refusing ever to reach the issue—that disconcerts us.

■ The FCC has declined to rebut the allegation squarely, replying only that the contention "runs to the merits of the Commission's actions, not to the issue of unreasonable delay." But this answer, it seems to us, is unsatisfactory. The charge that the FCC never intends to resolve the issue at all is something quite different from a suggestion that the Commission has, out of bias, improperly ruled in a comparative proceeding; the latter sort of malfeasance would create a final, reviewable order, while delay could continue indefinitely. *See TRAC*, 750 F.2d at 76. Therefore, while mandamus is not warranted—indeed, the facts of this case fall so short of egre-

---

5. Counsel indicated that the "minor step" of the issuance of the Commission's decision on the STV matter, *see supra* note 3, will be taken in the very near future, that the Review Board should complete its work within six months of that decision, and that review by the full Commission, if requested, should add thereto approximately six months.

6. Monroe quotes the published statement of then-Chairman of the FCC Mark Fowler to the effect that transferring a license from one holder to another is a confiscation of business and a "notably Marxist notion." BROADCASTING, Nov. 4, 1985, at 48. Be that as it may, license transfers are the law.

gious delay that we would withhold relief altogether had the FCC made any credible attempt to deny the allegation that it is deliberately dragging its feet—the unusual circumstance of an unrebutted[7] allegation of bad faith leads us to retain jurisdiction over the case until the license is awarded to ensure the kind of progress promised at oral argument. *See TRAC*, 750 F.2d at 80–81 (retaining jurisdiction where agency delay raises serious question of unreasonableness, but high standard for mandamus is not clearly met); *MCI*, 627 F.2d at 344–45 (same). Retention might be impracticable were many difficult and delicate questions still outstanding; counsel for the FCC has indicated that the steps remaining are relatively routine, however, and that circumstance is important to our decision to exercise our supervisory power.[8] *Cf. In re AFGE*, 837 F.2d 503, 504–07 (D.C.Cir.1988) (declining to impose a flat six-month limit on the FLRA's processing of negotiability appeals, noting that such a limit "is too blunt an instrument" for managing a proceeding in which the agency needs flexibility). We hope that the FCC will resolve this matter in the way it has indicated, *see supra* note 5, and that we will not be called on to intrude on its internal processes.

\* \* \* \* \* \*

Accordingly, we order that the court's mandate issue forthwith, and that the record in this proceeding be remanded to the Commission. Until the time of the final order awarding the license in question, Monroe may petition this court for appropriate relief in the event the FCC fails, absent a good faith reason, to adhere substantially to the schedule it set for itself by its representations to us through counsel. *See supra* note 5.

*It is so Ordered.*

---

**7.** Because the FCC fails to deny the charge, there is no need for fact-finding. *Cf. Kennecott Corp. v. EPA*, 804 F.2d 763, 767–68 (D.C.Cir. 1986) (appointing a magistrate to assist court of appeals in factual determinations).

**8.** Although the STV issue might seem somewhat intricate, we are assured that it is ready for resolution, and the record indicates that so few STV stations exist that a large expenditure of time on the matter would seem wasteful.