INDEPENDENCE MINING
CO., Plaintiff,

v.

Bruce BABBITT, in his capacity as Secretary of the United States Department of
the Interior, et al., Defendants.

No. CV–N–94–609–ECR.

United States District Court,
D. Nevada.

Feb. 6, 1995.

Order Denying Reconsideration
April 7, 1995.

Earl M. Hill and Ross E. deLipkau, of
Marshall, Hill, Cassas & deLipkau, Reno, NV
and Steven P. Quarles and R. Timothy

McCrum, and Mark C. Kalpin of Crowell & Moring, Washington, DC, for plaintiff.

Shirley Smith, Asst. U.S. Atty., Reno, NV, for defendants.

### ORDER

EDWARD C. REED, Jr., District Judge.

Independence Mining Company ("IMC") is the majority partner in a joint venture which operates the Jerritt Canyon Mine and Mill in Elko County, in eastern Nevada. Between February 1991 and September 1992, IMC filed twelve applications for patents covering a total of seventy-two lode mining claims and 156 millsites. Years have passed; no patents have been issued. Frustrated by the delay, IMC seeks to compel the Secretary to either issue the patents or deny the applications, within the next thirty to ninety days. The case is here on the parties' cross-motions for summary judgment.[1] Mandamus will not issue, and the government's motion for summary judgment will be granted.

The governing statute is the General Mining Law of 1872, *codified at* 30 U.S.C. §§ 22 *et seq.* It provides that

an individual may enter and explore land in the public domain in search of valuable mineral deposits. After minerals are discovered, the claimant may file a 'mining claim' with the Bureau of Land Management (BLM), which if approved, entitles the claimant to the right of exclusive possession of that claim, as long as the requirements of the Mining Act are met. Although ownership of a mining claim does not confer fee title to the claimant, the claimant does have the right to extract all minerals from the claim without paying royalties to the United States. In addition, a claimant may file a claim for a 'mill site,' which is 'nonmineral land ... [which] is used or occupied by the proprietor ... for mining or milling purposes.' A mill site is a tract of land, not to exceed five acres, on which can be placed processing facilities and other structures used to support the extraction of minerals from the claim. A claimant must follow essentially the same process to obtain a mill site as a mining claim.

An individual who possesses a valid mining claim may go through an additional process to obtain a patent, 'thereby purchasing from the Federal Government the land and minerals and obtaining ultimate title to them. Patenting, however, is not required, and an unpatented mining claim remains a fully recognized possessory interest.' A patented mining claim is one in which the government has passed its title to the claimant, giving him exclusive title to the locatable minerals, and, in most cases, the surface and all resources.... Mill sites may also be patented.

*Swanson v. Babbitt,* 3 F.3d 1348, 1350 (9th Cir.1993) (citations omitted); *see also California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 575–76, 107 S.Ct. 1419, 1422–23, 94 L.Ed.2d 577 (1987) (citations omitted).[2]

IMC paid for the mining claims and millsites at various times between 1991 and 1993, and received "first half final certificates."[3]

---

1. In August 1994, IMC filed both a complaint (Doc. # 1), seeking to compel action on the patent applications, and a motion (Doc. # 2) seeking an "order of mandamus" or an "order compelling agency action." The latter document, accompanied by briefing and exhibits, seeks all the relief requested in the complaint and is thus a *de facto* motion for summary judgment. The government has filed its own summary judgment motion (Doc. # 11); IMC opposed (Doc. # 14); and the government replied (Doc. # 16). Documents 2, 11, 14 and 16, taken together, thus amount to cross-motions for summary judgment.

2. Unpatented mining claims, it should be emphasized, are " 'real property in the fullest sense.' *Legal* title to land remains in the United States, but claimants enjoy valid, *equitable,* possessory title, subject to taxation, transferrable by deed or devise and otherwise possessing incidents of real property." *Marathon Oil Co. v. Lujan,* 751 F.Supp. 1454, 1459 (D.Colo.1990), *aff'd in part, rev'd in part,* 937 F.2d 498 (10th Cir.1991), *on remand* 771 F.Supp. 1556 (emphasis added) (citations omitted) (footnotes omitted).

3. The BLM itself considers "[t]he date purchase money is accepted" to be "the date equitable title vests in the applicant if entry is allowed." Bureau of Land Management, *Processing Mineral Patent Applications* H–3860–1, Rel. No. 3–265, at V–2 (1991) ("BLM Manual") (*citing United States v. Norman Whittaker,* 102 IBLA 162 (1988)). When the purchase money is paid, BLM issues what is called a "first half of mineral entry final certificate" or "FHFC." Issuance of the FHFC

At issue here are IMC's applications for patents, which would convey legal title and full ownership. It is a basic proposition of mining law that "the right to a patent immediately arises" when the purchase price is paid. *Marathon Oil Co.*, 751 F.Supp. at 1458 n. 10 (*quoting Benson Mining Co. v. Alta Mining Co.*, 145 U.S. 428, 431–32, 12 S.Ct. 877, 878–79, 36 L.Ed. 762 (1891)) (collecting cases). But that is so only if the patent application is valid:

> The right to a patent accrues when the claimant has filed a proper patent application and has paid his fee, regardless of when the Department of the Interior fulfills its purely administerial [sic] function of issuing the patent....
>
> For a patent right to vest upon application, however, the patent application must have been *valid* under existing law and the delay in the patent issuance must have been attributed to mere administerial [sic] delay in processing the otherwise valid application.

*Swanson*, 3 F.3d at 1353. Hence this dispute. Although IMC's patent applications have been pending for between two and one-half and four years, the Secretary has yet to pass on their validity.

Two stages of the patent application approval process are relevant here. The first stage involves mineral examinations and reports. After an FHFC has been issued, a mineral examiner, certified by the BLM, must "verify the applicant's compliance with the requirements of the mining laws by conducting a mineral examination of the mining claim or millsite." BLM Manual, at VII–1.[4] The mineral examiner's report "documents the results of the ... field investigation of the mining claim or mill site and also contains the ... examiner's conclusions concerning ... validity and recommendations to management for future actions." *Id.* at VII–3.

The second stage involves a process that may be termed "secretarial review." Until early 1993, patents could be issued by various Interior Department officials, including the BLM director in each state. *See* U.S. Dep't of the Interior, *Order No. 3163: Delegations—Patenting of Mining Claims* (March 2, 1993) ("Order 3163").[5] On March 2, 1993, Secretary Babbitt issued Order 3163, which revoked the "existing delegations allowing subordinate officials within the Department of the Interior to issue ... patents under the authority of the Mining Law of 1872," so that the Secretary could "assume the review and issuance of [patents] during the consideration by the 103d Congress of bills which, if adopted, would reform the mining laws...." Patents that could once have been issued by local BLM officials now can be issued only with the approval of the Secretary himself. And patent applications reach the Secretary only after wending their

---

"[c]onfirms [that] equitable title is vested in the applicant, subject to the confirmation of a discovery of a valuable mineral deposit by a mineral examiner," and "[c]ertifies that the applicant has satisfactorily complied with all of the 'paperwork' requirements of the Mining Law (title, proofs, posting requirements, purchase money)." *Id.* at VI–1.

When this case was filed, FHFCs had been issued for the millsites and for the twelve lode mining claims covered by applications N–54147, N–54148 and N–54149. They had not, however, been issued for the other sixty lode mining claims. IMC argued that because it had paid the purchase price and otherwise complied with the requirements for location of mining claims, issuance of FHFCs for those sixty claims was a purely ministerial duty of the Secretary and thus a proper matter for mandamus relief.

The issue is now moot: in its reply brief, the government represents that the contested FHFCs were issued several weeks ago. That is just as well, as IMC argued persuasively that FHFCs are merely the current incarnation of the "usual receipt" required, pursuant to 43 C.F.R. § 3862.4–6, to be issued by BLM upon its receipt of payment by the claimant of $5 per acre.

**4.** The mining statute and regulations, *see* 43 C.F.R. Subparts 3861 *et seq.* (surveys and plats), 3862 *et seq.* (lode mining claim patent applications) and 3864 *et seq.* (millsite patents), are sparse and somewhat vague, and the terminology and procedures governing the patent application process are derived mainly from the BLM Manual. *See Barrick Goldstrike Mines, Inc. v. Babbitt*, No. CV–N–93–550 HDM (PHA), at 11 & 12 n. 7 (D.Nev., filed March 24, 1994) (*"Barrick"*).

**5.** *See also* 43 C.F.R. § 1862.0–3(a) (a patent must be "issued under the authority of the Director [of BLM] and signed in the name of the United States").

way through a protracted and byzantine process of multi-level administrative review.[6]

The twelve applications fall into two groups, each stuck at a different stage in the process. Three applications (numbers N–54147, N–54148 and N–54149) were filed in February 1991; they cover a total of twelve lode mining claims. A draft mineral examiner's report on these claims was completed in April 1993; they were approved by BLM in November 1994 and now are awaiting the "secretarial review" described above. The other applications, filed between May 1991 and September 1992, cover the other sixty lode mining claims and 156 millsites; no mineral examination has been conducted on them, and no report prepared.

As noted above, IMC complains that secretarial review of its first three applications, and mineral examinations and reports on its other applications, have been unreasonably delayed. It asks the court to order the Secretary to complete these tasks within the thirty to ninety days. It should be emphasized that what IMC complains of is *unreasonable delay*. It does not claim that the requirement of a mineral examination and report is itself improper, but rather that BLM has taken too long to perform the examinations and write the reports. It does not argue that the Secretary had no right to revoke his subordinates' power to issue patents and introduce instead the process of "secretarial review" described above,[7] but rather that the review process is proceeding too slowly. And IMC does not ask that the Secretary be compelled to *approve* the applications and issue the patents, but simply that he be compelled to make a decision on the applications, one way or the other.[8]

---

6. The process "works" as follows:

> Patent applications which are ready for final review prior to issuance of patent will be reviewed and the duplicate patent surnamed by the proper State Director. From the State Director, the patent application package will be sent to the BLM Director. However, patent applications for claims which have no current history of production should be sent to the BLM Assistant Director, Energy and Minerals, for a technical review of the mineral report prior to director review. Following the Director's concurrence with the issuance of the patent, the package will be forwarded to the Division of Energy and Resources, Office of the Solicitor, for surnaming of the duplicate patent.
> ....
> For patent applications which did not undergo Secretarial review prior to the issuance of the FHFC, if anything irregular is found in the review of the documentation following issuance of [the] FHFC, the package may be sent to the Regional Solicitor for review of the pertinent documentation which preceded FHFC issuance. If all appears regular and after any necessary Regional Solicitor review has been completed ... the patent application package will be forwarded to the Solicitor for his concurrence with the issuance of the patent.
> ... [T]he package will [then] be forwarded to the Assistant Secretary, Land and Minerals Management, for his concurrence with the issuance of the patent, and, lastly, to [the Secretary of the Interior] for action.

*Barrick*, at 16–17 (*quoting* Memorandum from Acting Assistant Secretary of the Interior Michael P. Dombeck to Secretary of the Interior Bruce Babbitt, at 2–3 (May 4, 1993)).

7. Nor could it plausibly make such an argument:

> [I]t has long been recognized that the Secretary of Interior has plenary powers over the disposition of public lands. He has a continuing jurisdiction with respect to these lands until a patent issues, and he is not estopped by the principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors in interest. So long as the legal title remains in the Government, the Secretary has the power and duty upon proper notice and hearing to determine whether the claim is valid. Where additional evidence is necessary for a final determination, it is appropriate to set aside a former decision and remand a contest proceeding for further hearings. Therefore, even though the BLM ha[s] determined [the applicant's] claim to be valid and the Assistant Secretary [has] approved as final that determination, the Department ha[s] authority to reconsider its prior decision and to consider the sufficiency of the record made in connection with the patent application.

*Ideal Basic Indus., Inc. v. Morton*, 542 F.2d 1364, 1368 (9th Cir.1976) (citations omitted). If the Secretary has the power to reconsider a decision previously made by his subordinates, then *a fortiori* he has the power to rearrange the internal departmental processes whereby a decision on an application is initially made.

8. That is the correct remedy to seek. Mandamus "is an appropriate remedy to compel an administrative agency to act where it has failed to perform a *nondiscretionary, ministerial* duty." *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir.1991) (emphasis added). An order compelling issuance of the patents would thus exceed the court's authority, because—as the mineral

The law in this area has been summarized as follows:

> In the context of a claim of unreasonable delay, the first stage of judicial inquiry is to consider whether the agency's delay is so egregious as to warrant mandamus.... On reading the cases together, one can discern the hexagonal contours of a standard. Although the standard is hardly ironclad, ... it nevertheless provides useful guidance in assessing claims of agency delay: (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed." '

*Telecommunications Research & Action v. F.C.C.,* 750 F.2d 70, 79–80 (D.C.Cir.1984) (citations omitted) (*"TRAC"*); *see also In re Barr Laboratories, Inc.,* 930 F.2d 72 (D.C.Cir.1991).[9]

### A. *The Claims Awaiting Mineral Examinations and Reports.*

■ Mandamus relief is inappropriate with respect to the claims awaiting mineral examinations and reports.[10] According to BLM itself, the mineral examination and report stage of the process should take one year, and processing of patent applications "from start to complaint or patent issuance" two years. BLM Manual, at II–4. Unfortunately, the process in real life moves more slowly. The facts are not disputed. According to BLM, it received 59 mineral patent applications in 1988; in 1993, it received 154. Doc. # 11, Exh. "E" (Decl. of Brenda Aird), at 2. While the number of applications was rising, the number of mineral examiners was falling, from about 130 before 1990 to only 52 in November 1994. *Id.* The result of these trends is not surprising: in 1992, 129 patent applications were awaiting mineral examination; the backlog in October 1994 was 301. *Id.* In 1992, it took about three years from the time a patent application was assigned to a BLM district office for a mineral examination until completion and approval of the mineral report; it now takes about five years. *Id.* The problem is especially serious in Nevada. Of the 301 applications awaiting mineral examination, 90 are for claims in Nevada. Of those 90, 54 were referred to the BLM district offices before September 12, 1991, the date on which IMC's applications were referred to the district offices. *Id.*

■ We turn, then, to the *TRAC* analysis. IMC points to no specific statutory or

examinations have not been performed and the reports not written on most of the claims, and the "secretarial review" process not completed on the other claims—the Secretary "has not yet determined officially that all conditions to issuance of the patents have occurred" and thus has not reached the point where only the "purely ministerial act of issuing" them remains. *See id.* at 501. On the other hand, "[a]dministrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform," *id.* at 500, and it is within a court's power to order an agency to "expeditiously complete administrative action." *Id.* In short, the court cannot tell the Secretary whether to grant or deny the applications, because that decision involves an exercise of the Secretary's discretion and is therefore not ministerial. But the court can order the Secretary to make *some*

decision on the applications within a certain time, because he does have a ministerial duty to process the applications in a timely manner.

9. The *TRAC* court's analysis has "been followed in scores of cases in several circuits," II Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 12.3, at 220 (3rd ed. 1994), and by other district courts in this circuit. *See Hells Canyon Preservation Council v. Richmond,* 841 F.Supp. 1039, 1048 (D.Or.1993); *cf. Parravano v. Babbitt,* 861 F.Supp. 914, 930 (N.D.Cal.1994).

10. These claims are subject to "secretarial review," but that requirement is not yet relevant, because the claims are stuck at the earlier "mineral examination and report" stage of the process.

regulatory deadline for a decision,[11] and the first and second factors *TRAC* factors therefore tell us only that BLM's performance of mineral examinations, like its processing of patent applications overall, is subject to a "rule of reason" deadline. "Reasonable," in this context, no doubt means "expeditious." But that begs the question: when is agency delay so unreasonable that mandamus is warranted? The case law provides some guidance. In *TRAC* itself, a five-year delay by the FCC in making a "rate of return" inquiry was held not to warrant mandamus, although the court ordered the FCC to inform it of the dates by which it anticipated resolving the disputes before it. *TRAC*, 750 F.2d at 81. In *Towns of Wellesley, Concord and Norwood v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987), mandamus was denied where the FERC had been in the process of devising a final order for fourteen months. Most recently, and perhaps most analogously, in *In re City of Virginia Beach*, 42 F.3d 881, 885–86 (4th Cir.1994), mandamus was denied despite the FERC's concession that it would take four and one-half years from the time an application was filed until a final environmental impact statement was issued. A five-year wait for a mineral examination and report is troubling, and cannot instill confidence in the federal government, but it is not, per se, so egregious that mandamus is warranted.

This conclusion is supported by consideration of the other *TRAC* factors. The third and fifth factors overlap: at stake here are IMC's economic concerns, which are serious, but do not concern human health and welfare. *TRAC*'s fourth and sixth factors are the most important in this case. The fourth asks what the effect would be of a grant of relief on competing agency priorities; the sixth asks whether the agency has acted in good faith. Substituting a few phrases and proper names, the D.C. Circuit's decision in *In re Barr Laboratories*, in which Barr complained of unreasonable delay by the FDA in processing its drug application, is precisely on point:

Assuming constant resources for the [mineral examination and report] program, a judicial order putting [IMC] at the head of the queue simply moves all others back one space and produces no net gain. Agency officials not working on [IMC's] matters presumably have not just been twiddling their thumbs. Perhaps Congress should earmark more funds specifically to the [mineral examination and report] program, but that is a problem for the political branches to work out.

If [IMC] had shown that [BLM] had singled it out for mistreatment, judicial relief would then advance the cause of equal treatment and, despite the lack of any immediate net advancement of Congress's policy objectives, could make sense. ... [C]ases considering agency delay have often asked whether it was egregious, and especially shabby treatment of one applicant would seem exactly that.

. . . .

In short, we have no basis for reordering agency priorities. The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way.... While Congress clearly intended a faster track for [mineral examinations and reports] in general, it did not choose a super-priority for [IMC]....

. . . .

The result would not change even if [IMC] could back up its insinuation that the [BLM] could act more effectively if it tried. We have no reason to think that a judicial decree advancing one applicant would cure [BLM's] incompetence, if it exists and even if it is severe. A court order could shift, but not lift, the burden that inefficiency inflicts on [mineral applicants]. The agency could alleviate its own inefficiencies, perhaps through generic rulemaking, or other simplifications of the review process—but judges have neither the capacity nor the authority to require such measures.

---

**11.** *Compare, e.g., In re Barr Laboratories, Inc.,* 930 F.2d 72 (D.C.Cir.1991) (180–day period for

FDA to act on generic drug applications).

*Id.* at 75–76 (citations omitted) (quotation marks omitted).

As in *Barr*, so also in this case. Again, IMC does not dispute the facts as stated by BLM; it just wants the examination and report process speeded up. But there are only two ways to do that: either, given a fixed number of examiners, IMC can be given priority over other applicants, or the number of examiners can be increased. The court can mandate neither solution in this case. First, as the *Barr* court's reasoning makes clear, moving IMC's applications to the front of the line, ahead of other applications which have been pending even longer, might be appropriate if IMC had been singled out for mistreatment by the BLM. But IMC makes no such allegation. Indeed, in its briefing, IMC states that, apart from the patents issued as a result of the *Barrick* decision, *no* patents have been issued to *any* applicant in the nine months since the *Barrick* decision. *See* Doc. # 14, at 9. All applicants, not just IMC, are the victims of BLM's backlog.

Second, the number of mineral examiners can be increased in only two ways: either

BLM, and Interior generally, can allocate their resources differently,[12] or BLM can allow private contractors to perform the examinations and write the reports.[13] Either option might work; neither can properly be ordered by the court. BLM's decision to allocate only two mineral examiners to Nevada, and the Secretary's decision to create the National Biological Survey by shifting money and personnel from other agencies within the department, are, as the *Barr* court's analysis makes clear, internal matters. BLM, and Interior generally, have many duties; how they allocate their resources in the performance of those duties is an internal agency matter. Further, BLM was free to attack its backlog problem by contracting out the preparation of mineral reports to private mineral examiners. But IMC does not suggest (nor could it, plausibly) that the BLM was *obligated* to adopt such a program, or that, once adopted, the program could not be terminated by the Secretary. IMC's offer to fund the hiring by BLM of private mineral examiners is thus beside the point, because BLM is under no obligation to allow mineral examinations by private parties at all.[14]

**12.** IMC notes that BLM currently has only two mineral examiners assigned to perform mineral examinations and prepare reports for all of Nevada ("by far the largest gold-producing state in the Nation"), and that Secretary Babbitt found the resources to create a new agency, the National Biological Survey, within the Department of Interior, with 2,000 employees drawn from existing agencies, including BLM. Doc. # 14, at 8–9. IMC's point seems to be that BLM, and Interior generally, could shift their resources to increase the number of mineral examiners.

**13.** Indeed, at the time Secretary Babbitt took office, "the BLM had instituted a pilot program to contract-out the preparation of some of the final mineral reports in order to expedite the application process." Doc. # 14 at 9 (*citing Barrick,* at 17). The application at issue in *Barrick* was the first to be processed under this pilot program. *See Barrick* at 17 n. 12. The program was approved by BLM in December 1992, but was terminated by Secretary Babbitt in April 1993: with mining reform legislation in the offing, the Secretary did not believe it to be in the public interest to continue the pilot program, which accelerated the patenting process. *Id.* IMC is "ready and willing" to pay for performance of a mineral examination by a private contractor. *Id.*

**14.** Some tangential legal questions should be addressed briefly. First, IMC cites throughout its

briefing to the *Marathon Oil* and *Barrick* decisions, in which relief was granted to the plaintiff. In each case, however, *the mineral reports had already been completed.* In *Marathon,* which arose at a time when subordinate BLM officials could still issue patents, "the only thing standing between Marathon and its patents" was the signature of such an official, and the delay at issue was fourteen months. In *Barrick,* which arose after the process of "secretarial review" was instituted, it was the pendency of that review process that delayed issuance of the patents. *Marathon* and *Barrick* are thus of limited relevance in assessing the delay in performing mineral examinations at issue here.

Second, IMC, citing *Natural Resources Defense Council v. EPA,* 966 F.2d 1292, 1299–1300 (9th Cir.1992), suggests that the *TRAC* analysis of unreasonable agency delay, as elaborated and applied in *Barr,* is somehow disfavored in this Circuit. Doc. # 14 at 7 n. 13. The argument is without merit. In the NRDC case, the plaintiff sought *declaratory* relief after the EPA failed to meet specific deadlines set by Congress. The Ninth Circuit was understandably unimpressed by the EPA's citation to *Barr* for the proposition that *mandamus* may be inappropriate even if an agency misses a firm deadline.

Finally, IMC, throughout its briefing, cites cases stating that the right to a patent arises

### B. *The Claims Awaiting Secretarial Review.*

█ Mineral examinations have been performed, and reports prepared, on twelve lode mining claims covered by three of the applications (numbers N–54147, N–54148 and N–54149).[15] They are awaiting secretarial review. As far as this court can tell, IMC's arguments against the secretarial review process are based entirely on the decision in the *Barrick* case, *see* Doc. # 2 at 12–14, and we turn our attention to that decision.

It is clear, as the *Barrick* court recognized, *see Barrick* at 18, and as explained above, *see* note 7 *supra*, that direct review of mineral patent applications is within the Secretary's authority. It is also clear, as the *Barrick* court put it, that the Secretary need not "adopt the fastest and most efficient system available for processing the patents." *Barrick*, at 18. Nevertheless, the *Barrick* court granted the plaintiff's petition for mandamus, apparently on the ground that the Secretary was intentionally delaying the patent-issuance process. *Id.* at 14–18. The *Barrick* court relied primarily on two facts in support of this proposition. First, Secretary Babbitt, in issuing Order 3163, ended the recently-introduced program allowing private contractors to perform mineral examinations and prepare the reports, and made it clear that he was doing so in anticipation of mining reform legislation from the 103rd Congress. Second, the Secretary introduced the "labyrinthine" process of secretarial review with the intent to delay patent issuance. The *Barrick* court, in sum, concluded that relief was warranted because the Secretary had "dismantled an efficient system and replaced it with a system *intended* to delay." *Id.* at 18 (emphasis in original).

We agree with the *Barrick* court's analysis of the facts. It seems overwhelmingly likely that the Secretary's motive, both in cancelling the program allowing private contractors to perform mineral examinations and in mandating secretarial review, was to slow down the process of patent issuance. Unlike the *Barrick* court, however, we do not think this leads to the conclusion that mandamus is appropriate. The question, it seems to us, is not what the Secretary's motivations were, but whether his actions were within the scope of his powers.

We think that they were. The BLM, as noted above, did not have to allow private contractors to conduct mineral examinations in the first place. And if BLM did not have to allow "contracting-out" to begin with, then surely the Secretary could cancel the program after it went into effect. To hold otherwise, or to hold that the Secretary could cancel the program only for a "good" reason, would be to interfere in a wholly inappropriate way with the internal workings of the BLM and the Department of the Interior.

A similar analysis applies to the Secretary's decision to mandate the multi-level process of secretarial review. It was, as explained above, clearly within the Secretary's power to institute this process of review. The relevant question is not whether the review process is *intended* to delay issuance of patents, but whether it *has* caused delay sufficiently egregious to merit mandamus. We think not. The applications were approved by BLM and forwarded to the Secretary for review in November 1994, only a few months ago. Even if we take April 1993—when the draft mineral reports were finished—to be the date on which the secretarial review process began, less than two

---

immediately, and patent issuance is thus ministerial, upon filing of a valid application. But, as noted above, the *Swanson* court recently made clear that that is true only if the application is *valid*. The theory of IMC's case is *not* that its applications are indisputably valid and that the Secretary has refused to issue patents on them. It is, rather, that the Secretary is taking too long to decide *whether* the applications are valid.

**15.** According to BLM, the validity of the millsites depends on the validity of the twelve lode mining claims covered by these three applications. Doc. # 16, at 7. We assume for present purposes that this is true, because the assumption is to IMC's benefit: IMC is better off if its millsites' validity depends on the validity of the twelve mining claims that await only secretarial review, than if it depends on the validity of the sixty lode mining claims which await mineral examinations and reports and are thus stuck at an earlier stage in the process.

years have passed. That is delay, but not of the sort that justifies mandamus relief.

The Secretary's conduct may well be, as the *Barrick* court put it, "shameful," and it seems clearly contrary to Congress's intent, as expressed in the 1872 mining statute. But the truly extraordinary measure of a writ of mandamus, reaching into an agency of the executive branch and dictating the details of its internal operations, is not warranted. As the leading treatise explains,

> [w]hether the problem of agency delay is viewed at the level of an individual case or on a broader basis, the most effective remedies for delay are available through the political process rather than through the judicial process. A party who is displeased with agency delay in a particular case is more likely to achieve success in expediting the matter through political pressure than through judicial pressure.

II Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 12.4, at 226 (3rd ed.1994). IMC's frustration is understandable, but its remedy, if any, lies with Nevada's congressional delegation, not in the federal courts.

**IT IS THEREFORE HEREBY ORDERED** that, for the above-stated reasons, IMC's motion (Doc. # 2) is **DENIED** and the Secretary of the Interior's motion (Doc. # 11) for summary judgment is **GRANTED**.

The clerk shall enter judgment accordingly.

### ORDER ON RECONSIDERATION

We previously granted summary judgment in favor of the government in this case, Doc. # 18, and we assume familiarity with that order. The plaintiff, Independence Mining Company ("IMC"), asks the court to reconsider its decision. (Doc. # 20.) The government has opposed, Doc. # 23, and IMC has replied. Doc. # 25. The motion for reconsideration will be **DENIED**.

IMC complained of unreasonable delay by the Bureau of Land Management (BLM), and sought a writ of mandamus compelling the Secretary of the Interior to process, within a fixed time, its applications for patents to certain mineral lands in northeastern Nevada. The "hexagonal contours of a standard" for determining when mandamus should issue on a claim of unreasonable delay by an agency were set out in *Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70, 80 (D.C.Cir.1984) ("*TRAC*"), and the court granted summary judgment to the government in light of that standard. IMC now argues that the court erred in applying three of the *TRAC* factors.

I. *The "Rule of Reason" and the Statutory Scheme*

*TRAC*'s first and second factors provide that

> the time agencies take to make decisions must be governed by a 'rule of reason' . . . where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason . . .

*TRAC*, 750 F.2d at 80. In our earlier order, we had this to say:

> IMC points to no specific statutory or regulatory deadline for a decision, and the first and second *TRAC* factors therefore tell us only that BLM's performance of mineral examinations, like its processing of patent applications overall, is subject to a "rule of reason" deadline. "Reasonable," in this context, no doubt means "expeditious." But that begs the question: when is agency delay so unreasonable that mandamus is warranted?

Doc. # 18 at 10 (footnote omitted).

> IMC now argues that the court failed to give sufficient consideration to the second *TRAC* factor, which provides that the 'statutory scheme may supply content for the rule of reason.' In this case . . . the court must consider the unique statutory context of the patent application process under the Mining Act of 1872. The patent application does not present a discretionary decision for the Secretary, like the issuance of a mineral lease or prospecting permit under the federal mineral leasing laws. To the contrary, a vested 'right to a patent' immediately arises, at least, 'when

the purchase price is paid,' as here. Accordingly, lengthy delays that may be tolerable under a discretionary application system are intolerable under a statutory scheme where, as here, the applications involve vested property rights.

Doc. #20 at 11–12 (citations omitted).

Congress often fails to provide express statutory deadlines for administrative action, *see* Note, *Judicial Review of Agency Delay and Inaction Under Section 706(1) of the Administrative Procedure Act*, 55 Geo. Wash.L.Rev. 635, 653 (1987), and IMC correctly notes that courts may therefore have to look to more opaque indicia, such as the relevant "statutory scheme," in an attempt to give content to the "rule of reason" standard. *See, e.g., Oil, Chemical & Atomic Workers Int'l v. Zegeer*, 768 F.2d 1480, 1488 (D.C.Cir. 1985) (the legislative history of the Mine Act suggested that "Congress did not expect MSHA to tarry for years over its health and safety rulemaking").

█ We have already done so. In our earlier order, to reiterate, we noted that BLM was "subject to a 'rule of reason' deadline," and held that, although there was no express deadline, "reasonable," in this context, meant "expeditious." IMC's current argument, which emphasizes the "vested" nature of the rights involved and the Secretary's consequent "nondiscretionary" duty to issue the patents, is set forth above. So far as we can tell, its thrust is that a closer look at the statutory scheme would reveal that "reasonable" in this case means not merely "expeditious," but "almost immediate." The argument is not persuasive.

As this court recognized in its earlier order, "the right to a patent immediately arises" when the purchase price is paid. Doc. #18 at 4. What IMC conveniently fails to mention in its current argument, however, is that the right vests on application "*only if* the patent application is valid." *Id.* (*quoting Swanson v. Babbitt*, 3 F.3d 1348, 1353 (9th Cir.1993)). IMC thus misrepresents the status of its applications when it suggests that it

has "vested rights" and that the Secretary therefore has a nondiscretionary, ministerial duty to issue the patents. Rather, IMC has a vested right to the patents *if* its applications are valid. Unless and until the applications are determined to be valid, IMC has no vested rights at all.

We have, to reiterate, already held that BLM should act "expeditiously" To the extent IMC, citing its vested rights, seeks to impose a duty of even speedier action on BLM, its argument is flawed, because whether the applications are valid, and whether IMC's right to the patents has therefore vested, is precisely what BLM has not yet determined. Its delay in making that determination is what this case is all about.

## II. *Serious Economic Harm*

The third and fifth *TRAC* factors provide that

> delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; ... the court should also take into account the nature and extent of the interests prejudiced by the delay

*TRAC*, 750 F.2d at 80. The more serious the harm threatened by avoidable delay, the less deference ought to be accorded an agency, and the more likely it is that mandamus is appropriate. *See Cutler v. Hayes*, 818 F.2d 879, 898 (D.C.Cir.1987). "Economic harm is clearly an important consideration, and will, in some cases, justify court intervention," but such intervention is more likely where human lives are at stake. *Id.* In our earlier order, we observed simply that at issue here are "IMC's economic concerns, which are serious, but do not concern human health and welfare." Doc. #18 at 12.

IMC does not dispute this. On the contrary, it agrees, and has now submitted additional evidence, seeking to demonstrate just *how* serious its concerns are. *See* Doc. #20 at 13–15.[1] To this end, it has submitted a

---

1. Each party has submitted additional evidence on reconsideration. That is improper; all evidence should have been submitted with the cross-motions for summary judgment. However,

the court may consider the additional evidence, *see* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2804 (1973), and we choose to do so. Of course, as each party has

lengthy environmental impact statement, Doc. # 20 Exh. 2, detailing the importance of the Jerritt Canyon Mine to the economy of Elko County. IMC's argument, repeated in its reply brief, Doc. # 25 at 7, is that the Secretary's delay in issuing the patents "has cast a cloud of uncertainty over IMC's mining claims and discourages new capital investment," Doc. # 18 at 14, and that this in turn threatens the continued operation of the mine. The Secretary's delay in passing on the validity of the patent applications, says IMC, thus "threatens hundreds of jobs and implicates serious public welfare concerns." Doc. # 20 at 15.

To the extent IMC emphasizes that it has serious economic interests at stake here, which may be prejudiced by delay, it has added nothing to what we recognized in our original order.[2] As noted above, economic injury may justify court intervention. Perhaps recognizing, however, that it can make a stronger case for mandamus if it can demonstrate that "human health or welfare" is at stake,[3] IMC seeks to portray its own economic injury as harm to its employees' welfare, by suggesting that BLM's failure to issue the patents not only causes IMC direct economic harm, but threatens its employees' jobs.

The problem with IMC's argument is this: *any* harm to a business's finances, whether caused by regulatory delay or something else, tends to weaken its employees' job security. Economic harm to a business, however, is not the same thing as the harm to "human welfare" resulting from unemployment. In this case, for example, we may assume that IMC does stand to suffer economic injury because the patents have not been issued.

But IMC offers only a speculative assertion, unsupported by explanation or evidence, that this economic harm will result in the loss of "hundreds of jobs." IMC has unpatented mining claims. As we noted in our earlier order:

> Unpatented mining claims, ... are " 'real property in the fullest sense.' *Legal* title to land remains in the United States, but claimants enjoy valid, *equitable,* possessory title, subject to taxation, transferrable by deed or devise and otherwise possessing incidents of real property."

Doc. # 18 at 3 n. 2; *see also Swanson v. Babbitt,* 3 F.3d 1348, 1350 (9th Cir.1993). Because an unpatented location is "property in the fullest sense," its owner

> has as many rights to the minerals underlying it as would one who holds under a patent, including the right to appropriate and remove all valuable ores and minerals—all there is of value in the estate—without making payments to the United States.

2 *Am. L. of Mining* § 51.02. In short, IMC can mine its claims with or without patents. While it would no doubt be cheaper for IMC to operate the Jerritt Canyon Mine if it had the patents it seeks, IMC has not explained how the continued operation of the mine, and thus the job security of the people employed there, depends, in any *direct* or *immediate* sense, on issuance of the patents.

### III. *Bad Faith*

#### A. *Bad Faith as Evidence that Delay is Unreasonable*

The sixth *TRAC* factor provides that

seen fit to submit additional evidence at this stage of the proceedings, neither party will be heard to complain that we have considered such evidence.

**2.** "[D]evelopment of a mine requires considerable capital," and claim owners and lenders therefore "usually conclude that the great financial investment required cannot be risked without the security of title which only a patent affords." 2 *Am.L. of Mining* § 51.02. And it may be, as another court recently observed, that a "considerable burden" results from lack of a patent, because the claimant has to "deal with government agencies and their requirements," which it

would not have to do if it had patents to its claims and thus legal title in fee simple, rather than mere equitable title. *Santa Fe Pacific Gold Corp. v. Babbitt,* No. 94–1140K (AJB), slip op. at 8 (S.D.Cal. Nov. 2, 1994).

**3.** And perhaps aware that the D.C. Circuit once at least suggested that a "five year delay in adjudicating claims for a form of unemployment assistance payments" implicated "human health and welfare," rather than mere economic injury. *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Board,* 750 F.2d 81, 86 (D.C.Cir.1984).

the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed." ' *TRAC*, 750 F.2d at 80. Then again, "[i]f the court determines that the agency [has] delay[ed] in bad faith, it should conclude that the delay is unreasonable." *Cutler v. Hayes*, 818 F.2d 879 (D.C.Cir.1987).

IMC focuses on the two procedural changes instituted by Secretary Babbitt—termination of four-month old pilot program allowing private contractors to perform mineral examinations, and initiation of the "secretarial review" requirement—and on the "bad faith" aspect of the sixth *TRAC* factor. Its argument is simple: "it was plainly not within the Secretary's powers to prohibit the use of private contractors and create a byzantine secretarial review process for the expressly *intended* purpose of delay." Doc. #20 at 10–11.

The argument is unconvincing. First, contrary to IMC's repeated assertions, this court did *not* find, in its prior order, that the Secretary's actions were taken for purposes of delay.[4] Second, it may be that a finding of bad faith will mandate a finding of unreasonable delay.[5] To the extent we suggested in our prior order that the Secretary's motivations were irrelevant, we now modify that order: the Secretary's motivations for instituting the challenged procedural changes are at least relevant. It must be kept in mind, however, that IMC's complaint is that the Secretary has instituted changes in the *procedure* for handling patent applications. For the reasons set out below, we believe that such changes in an agency's internal procedures are subject to the most deferential level of judicial review, and we decline to alter our prior judgment in this case.

### B. *Adoption of Procedures as a Matter of Agency Discretion*

As a general matter, it is "absolutely clear" that [a]bsent constitutional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of

---

**4.** It is important to remember that the case was here on the parties' cross-motions for summary judgment. As the party against whom summary judgment was entered, IMC was entitled to the benefit of every doubt. But the *basis of our decision* in that order was that, whatever the Secretary's motivations might be, his actions were within the scope of his powers. We could therefore assume, *arguendo*, that IMC's claims about the Secretary's motivations were correct; this made no difference to the decision.

**5.** Although we are aware of no case, and IMC cites none, in which a court actually has found unreasonable delay on the ground that the agency has acted in bad faith. In *In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C.Cir.1991), the court stated that "[w]here the agency has manifested bad faith, as by singling someone out for bad treatment or asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities." Having said that, however, the court then found that the FDA had *not* acted in bad faith, even though it had ignored an express 180-day statutory deadline for action, and although the plaintiff complained that it had been singled out for bad treatment (a charge the court declined to address for procedural reasons).

Similarly, in *In re Monroe Communications Corp.*, 840 F.2d 942, 946–47 (D.C.Cir.1988), the court's concern was with "the suggestion [that] the FCC is purposely [sic] shirking its obligation ... to avoid unreasonable delay—that it seeks to evade the event it finds undesirable by refusing ever to reach the issue...." The court noted that it "would withhold relief altogether had the FCC made any credible attempt to deny the allegations that it is deliberately dragging its feet," but, faced with the "unusual circumstance of an unrebutted allegation of bad faith," chose to retain jurisdiction.

In *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C.Cir. 1987), the court noted that a finding of bad faith should lead to a finding of unreasonable delay; it did so, however, in the context of setting forth all the factors involved in an "unreasonable delay" analysis, and expressed no opinion on whether the FDA actually had acted in bad faith. *In re Center for Auto Safety*, 793 F.2d 1346 (D.C.Cir. 1986), did not address bad faith (although it did note, *id.* at 1354 n. 55, that unreasonable delay is less likely to be found where there is no statutory deadline). In *Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21, 34 (D.C.Cir. 1984), the court noted that the FDA appeared to have "embarked on the least responsive course short of inaction," but expressly noted that a finding of bad faith is not necessary to a finding of unreasonable delay and remanded the case. In *Nat'l Congress of Hispanic Am. Citizens v. Marshall*, 626 F.2d 882, 890 (D.C.Cir.1979), the court noted that good faith was required but that there was no evidence of bad faith in the record.

inquiry capable of permitting them to discharge their multitudinous duties." '

*Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Defense Council*, 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978); *see also Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 817 (9th Cir.1990) (same).

Also, the complaint here is not, as so often it is in administrative litigation, that the agency provided too little "process" to the plaintiff. It is, rather, that the agency provided too much—that it has intentionally slowed the patent approval process by barring private contractors from performing mineral examinations and by adding the requirement of "secretarial review." As the Court has noted, however, "Congress intended that the discretion of the *agencies* and not that of the courts be exercised in determining when extra procedural devices should be employed." *Id.* 435 U.S. at 546, 98 S.Ct. at 1213.

### C. *Standard of Review Applied to an Agency's Adoption or Termination of Procedures*

IMC does not explain what standard of review applies when a plaintiff claims that a particular agency procedure has been instituted, or terminated, in order to delay the agency's proceedings. Is the court to look at the effects of the change, or the agency's motive for making it? Neither party cites any cases on point. We note the following.

First, any time an agency adds a layer of review, or some other procedural protection, to its existing procedures, an unhappy party may claim that the agency changed its procedures for the "wrong" reasons, e.g., to slow the process overall rather than to improve accuracy or fairness. The problem is that agency decision-making will almost certainly be delayed every time existing procedures are changed by, say, adding another layer of review, even if this is done for the "right" reasons.

Second, we are guided by Judge (now Justice) Ginsburg's opinion in *Oil, Chemical & Atomic Workers Int'l v. Zegeer*, 768 F.2d 1480 (D.C.Cir.1985). In that case, the MSHA included in its projected rulemaking schedule a "provision for a preproposal draft stage spanning several months," which the petitioners attacked as duplicative and unnecessary. *Id.* at 1487. The court[6] declined to find unreasonable delay, explaining that it would not second-guess "MSHA's judgment that its ultimate disposition will be facilitated by including in the rulemaking process a preproposal draft stage," especially where MSHA had used preproposal drafts "consistently and successfully" in the past and where Congress was aware of the procedure. *Id.* The case involved "complex scientific and technical issues," presumably significantly more complicated than those involved in this case, but we think that the basic principle applies here as well.

Third, as the Court has said in the context of rulemaking:

if courts continually review agency proceedings to determine whether the agency employed procedures which were, in the court's opinion, perfectly tailored to reach what the court perceives to be the 'best' or 'correct' result, judicial review would be totally unpredictable.

*Vermont Yankee*, 435 U.S. at 546, 98 S.Ct. at 1213.

In summary, we assume "bad faith" can lead to a finding of "unreasonable delay," especially, for example, where an agency takes no action at all or where it discriminates against a single party. But in the search for "bad faith" we are reluctant to probe an agency's motives for adopting, terminating, or changing its internal procedures. For the reasons set forth above, we think an exceptional degree of deference must be accorded the agency's decisions in these matters. If the agency can offer a reasonable explanation for its decision, that will suffice.[7]

---

**6.** After noting indications in the legislative history suggesting that Congress did not intend MSHA to "tarry for years over its health and safety rulemakings," observing that human life and health were at stake, and stating that the evidence did not demonstrate that expediting the rulemaking was "likely to crowd out agency action on items of higher priority." *Id.* at 1488.

**7.** We emphasize that an agency which prolonged its proceedings indefinitely, by mistreating a par-

D. *Changes in Agency Procedure in this Case*

██ We deal here not with irrational, arbitrary, or unprecedented procedures—not with "a totally unjustified departure from well-settled agency procedures of long standing" that "might require judicial correction," *Vermont Yankee,* 435 U.S. at 542, 98 S.Ct. at 1211—but, rather, with two discrete changes in the Department of the Interior's internal processes for determining the validity of patent applications: the Secretary's termination of the program allowing private contractors to perform mineral examinations, and his institution of the "secretarial review" requirement before a patent can issue.

With respect to the private contractors, we note that, historically, mineral examinations have been performed by BLM. The pilot program allowing private contractors to perform those examinations was initiated in the last months of the Bush Administration, and was, apparently, only four months old when it was terminated by the Clinton Administration. As we noted in our prior order, the Secretary was under no obligation to allow private contracting in the first place, and was therefore free to terminate the program. That is especially so, we think, for two reasons. First, termination of the private contracting program represents not a change from long-standing practice, but, rather, a return, after a very brief departure, to the historical practice of having BLM itself perform the examination. Second, the Secretary has provided a reasonable explanation for his decision:

In the early spring of 1993, the Clinton Administration became aware of a BLM pilot program to contract out preparation of mineral reports. Established shortly before the Bush Administration left office, the program served to, indeed was designed to, accelerate the issuance of mineral patents. The new Administration considered the pilot program ill-advised because it presented a serious potential for

conflicts of interest. The program allowed private interests seeking to take title to valuable public resources essentially to hire the mineral examiner undertaking one of the most crucial investigations and determinations in the patenting process—the mineral report leading to the determination of whether the applicant had made a 'discovery' of a 'valuable mineral deposit.'

Doc. # 23, Exh. A at ¶ 6.

With respect to the process of "secretarial review," we repeat what we said in our prior order and what our circuit court said years ago:

[I]t has long been recognized that the Secretary of Interior has plenary powers over the disposition of public lands. He has a continuing jurisdiction with respect to these lands until a patent issues, and he is not estopped by the principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors in interest. So long as the legal title remains in the Government, the Secretary has the power and duty upon proper notice and hearing to determine whether the claim is valid. Where additional evidence is necessary for a final determination, it is appropriate to set aside a former decision and remand a contest proceeding for further hearings. Therefore, even though the BLM ha[s] determined [the applicant's] claim to be valid and the Assistant Secretary [has] approved as final that determination, the Department ha[s] authority to reconsider its prior decision and to consider the sufficiency of the record made in connection with the patent application.

*Ideal Basic Indus., Inc. v. Morton,* 542 F.2d 1364, 1368 (9th Cir.1976) (citations omitted). If the Secretary has the power to reconsider a decision previously made by his subordinates, then *a fortiori* he has the power to rearrange the internal departmental processes whereby a decision on an application is

---

ticular party or by taking no action at all in a class of cases, might well be subject to mandamus. By our statement here, we do not mean to suggest that an agency can, with impunity, similarly prolong its proceedings and claim that it has not yet reached a final decision on the mat-

ter, and thus avoid making a decision it does not wish to make, by adopting new procedures and additional layers of review. As explained below, however, that worst-case hypothetical does not apply here.

initially made, so that all of his subordinates' recommendations come to him for review before they ever become final decisions. We also note that the Secretary has provided a plausible explanation for his decision to institute secretarial review, i.e., a desire to ensure that uniform standards are applied to all patent applications.

In summary, the Secretary has made two discrete, and fairly minor, changes in the Department's procedures for processing patent applications. Each change was clearly within his powers, and for each he has provided a reasonable explanation. We decline to find unreasonable delay.

**IT IS THEREFORE HEREBY ORDERED** that, for the reasons stated above, IMC's motion (Doc. # 20) for reconsideration is **DENIED.**