# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 2, 2012        Decided August 13, 2013
Ordered Held in Abeyance August 3, 2012

No. 11-1271

IN RE: AIKEN COUNTY, ET AL.,
PETITIONERS

STATE OF NEVADA,
INTERVENOR

———

On Petition for Writ of Mandamus

———

*Andrew A. Fitz*, Senior Counsel, Office of the Attorney General for the State of Washington, argued the cause for petitioners. With him on the briefs were *Robert M. McKenna*, Attorney General, *Todd R. Bowers*, Senior Counsel, *Thomas R. Gottshall*, *S. Ross Shealy*, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *William Henry Davidson II*, *Kenneth Paul Woodington*, *James Bradford Ramsay*, *Robin J. Lunt*, *Barry M. Hartman*, *Christopher R. Nestor*, and *Robert M. Andersen*.

*Jerry Stouck* and *Anne W. Cottingham* were on the brief for *amicus curiae* Nuclear Energy Institute, Inc. in support of petitioners.

*Charles E. Mullins*, Senior Attorney, U.S. Nuclear Regulatory Commission, argued the cause for respondent.

With him on the brief were *Stephen G. Burns*, General Counsel, *John F. Cordes Jr.*, Solicitor, and *Jeremy M. Suttenberg*, Attorney.

*Martin G. Malsch* argued the cause for intervenor State of Nevada. With him on the briefs were *Charles J. Fitzpatrick* and *John W. Lawrence*.

Before: GARLAND, *Chief Judge*, KAVANAUGH, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Senior Circuit Judge* RANDOLPH joins except as to Part III.

Concurring opinion filed by *Senior Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Chief Judge* GARLAND.

KAVANAUGH, *Circuit Judge*: This case raises significant questions about the scope of the Executive's authority to disregard federal statutes. The case arises out of a longstanding dispute about nuclear waste storage at Yucca Mountain in Nevada. The underlying policy debate is not our concern. The policy is for Congress and the President to establish as they see fit in enacting statutes, and for the President and subordinate executive agencies (as well as relevant independent agencies such as the Nuclear Regulatory Commission) to implement within statutory boundaries. Our more modest task is to ensure, in justiciable cases, that agencies comply with the law as it has been set by Congress. Here, the Nuclear Regulatory Commission has continued to violate the law governing the Yucca Mountain licensing

process. We therefore grant the petition for a writ of mandamus.

I

This case involves the Nuclear Waste Policy Act, which was passed by Congress and then signed by President Reagan in 1983. That law provides that the Nuclear Regulatory Commission "shall consider" the Department of Energy's license application to store nuclear waste at Yucca Mountain and "shall issue a final decision approving or disapproving" the application within three years of its submission. 42 U.S.C. § 10134(d). The statute allows the Commission to extend the deadline by an additional year if it issues a written report explaining the reason for the delay and providing the estimated time for completion. *Id.* § 10134(d), (e)(2).

In June 2008, the Department of Energy submitted its license application to the Nuclear Regulatory Commission. As recently as Fiscal Year 2011, Congress appropriated funds to the Commission so that the Commission could conduct the statutorily mandated licensing process. Importantly, the Commission has at least $11.1 million in appropriated funds to continue consideration of the license application.

But the statutory deadline for the Commission to complete the licensing process and approve or disapprove the Department of Energy's application has long since passed. Yet the Commission still has not issued the decision required by statute. Indeed, by its own admission, the Commission has no current intention of complying with the law. Rather, the Commission has simply shut down its review and consideration of the Department of Energy's license application.

Petitioners include the States of South Carolina and Washington, as well as entities and individuals in those States. Nuclear waste is currently stored in those States in the absence of a long-term storage site such as Yucca Mountain.

Since 2010, petitioners have sought a writ of mandamus requiring the Commission to comply with the law and to resume processing the Department of Energy's pending license application for Yucca Mountain. Mandamus is an extraordinary remedy that takes account of equitable considerations. The writ may be granted "to correct transparent violations of a clear duty to act." *In re American Rivers and Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (internal quotation marks omitted); *see also Arizona v. Inter Tribal Council of Arizona, Inc.*, No. 12-71, slip. op. at 17 n.10 (U.S. 2013) (noting that if the federal Election Assistance Commission did not act on a state's statutorily permitted request, "Arizona would be free to seek a writ of mandamus to 'compel agency action unlawfully withheld or unreasonably delayed'") (quoting 5 U.S.C. § 706(1)).

In 2011, a prior panel of this Court indicated that, if the Commission failed to act on the Department of Energy's license application within the deadlines specified by the Nuclear Waste Policy Act, mandamus likely would be appropriate. *See In re Aiken County*, 645 F.3d 428, 436 (D.C. Cir. 2011). In 2012, after a new mandamus petition had been filed, this panel issued an order holding the case in abeyance and directing that the parties file status updates regarding Fiscal Year 2013 appropriations. At that time, we did not issue the writ of mandamus. Instead, in light of the Commission's strenuous claims that Congress did not want the licensing process to continue and the equitable considerations appropriately taken into account in mandamus

cases, we allowed time for Congress to clarify this issue if it wished to do so. But a majority of the Court also made clear that, given the current statutory language and the funds available to the Commission, the Commission was violating federal law by declining to further process the license application. And the Court's majority further indicated that the mandamus petition eventually would have to be granted if the Commission did not act or Congress did not enact new legislation either terminating the Commission's licensing process or otherwise making clear that the Commission may not expend funds on the licensing process. *See* Order, *In re Aiken County*, No. 11-1271 (D.C. Cir. Aug. 3, 2012).

Since we issued that order more than a year ago on August 3, 2012, the Commission has not acted, and Congress has not altered the legal landscape. As things stand, therefore, the Commission is simply flouting the law. In light of the constitutional respect owed to Congress, and having fully exhausted the alternatives available to us, we now grant the petition for writ of mandamus against the Nuclear Regulatory Commission.

II

Our analysis begins with settled, bedrock principles of constitutional law. Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute. So, too, the President must abide by statutory *prohibitions* unless the President has a constitutional objection to the prohibition. If the President has a constitutional objection to a statutory mandate or prohibition, the President may decline to follow the law unless and until a

final Court order dictates otherwise. But the President may not decline to follow a statutory mandate or prohibition simply because of policy objections. Of course, if Congress appropriates no money for a statutorily mandated program, the Executive obviously cannot move forward. But absent a lack of funds or a claim of unconstitutionality that has not been rejected by final Court order, the Executive must abide by statutory mandates and prohibitions.

Those basic constitutional principles apply to the President and subordinate executive agencies. And they apply at least as much to independent agencies such as the Nuclear Regulatory Commission. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 525-26 (2009) (opinion of Scalia, J., for four Justices) (independent agency should be subject to same scrutiny as executive agencies); *id.* at 547 (opinion of Breyer, J., for four Justices) (independent agency's "comparative freedom from ballot-box control makes it all the more important that courts review its decisionmaking to assure compliance with applicable provisions of the law").

In this case, however, the Nuclear Regulatory Commission has declined to continue the statutorily mandated Yucca Mountain licensing process. Several justifications have been suggested in support of the Commission's actions in this case. None is persuasive.

*First*, the Commission claims that Congress has not yet appropriated the *full* amount of funding necessary for the Commission to *complete* the licensing proceeding. But Congress often appropriates money on a step-by-step basis, especially for long-term projects. Federal agencies may not ignore statutory mandates simply because Congress has not yet appropriated all of the money necessary to complete a

project. *See City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) (when statutory mandate is not fully funded, "the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint"). For present purposes, the key point is this: The Commission is under a legal obligation to continue the licensing process, and it has at least $11.1 million in appropriated funds – a significant amount of money – to do so. *See* Commission Third Status Report, at 2 (Apr. 5, 2013).

*Second*, and relatedly, the Commission speculates that Congress, in the future, will not appropriate the additional funds necessary for the Commission to complete the licensing process. So it would be a waste, the Commission theorizes, to continue to conduct the process now. The Commission's political prognostication may or may not ultimately prove to be correct. Regardless, an agency may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates. A judicial green light for such a step – allowing agencies to ignore statutory mandates and prohibitions based on agency speculation about future congressional action – would gravely upset the balance of powers between the Branches and represent a major and unwarranted expansion of the Executive's power at the expense of Congress.

*Third*, the Commission points to Congress's recent appropriations to the Commission and to the Department of Energy for the Yucca Mountain project. In the last three years, those appropriations have been relatively low or zero. The Commission argues that those appropriations levels demonstrate a congressional desire for the Commission to shut down the licensing process.

But Congress speaks through the laws it enacts. No law states that the Commission should decline to spend previously appropriated funds on the licensing process. No law states that the Commission should shut down the licensing process. And the fact that Congress hasn't yet made additional appropriations over the existing $11.1 million available to the Commission to continue the licensing process tells us nothing definitive about what a future Congress may do. As the Supreme Court has explained, courts generally should not infer that Congress has implicitly repealed or suspended statutory mandates based simply on the amount of money Congress has appropriated. *See TVA v. Hill*, 437 U.S. 153, 190 (1978) (doctrine that repeals by implication are disfavored "applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act"); *United States v. Langston*, 118 U.S. 389, 394 (1886) ("a statute fixing the annual salary of a public officer at a named sum . . . should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount for the services of that officer for particular fiscal years"); *cf.* 1 GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW at 2-49 (3d ed. 2004) ("a mere failure to appropriate sufficient funds will not be construed as amending or repealing prior authorizing legislation").

In these circumstances, where previously appropriated money is available for an agency to perform a statutorily mandated activity, we see no basis for a court to excuse the agency from that statutory mandate.

*Fourth*, the record suggests that the Commission, as a policy matter, simply may not want to pursue Yucca Mountain as a possible site for storage of nuclear waste. But Congress sets the policy, not the Commission. And policy

disagreement with Congress's decision about nuclear waste storage is not a lawful ground for the Commission to decline to continue the congressionally mandated licensing process. To reiterate, the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress. *See Lincoln v. Vigil*, 508 U.S 182, 193 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ."); 18 Comp. Gen. 285, 292 (1938) ("the question with the accounting officers is not the apparent general merit of a proposed expenditure, but whether the Congress, controlling the purse, has by law authorized the expenditure").[1]

---

[1] Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, *cf. infra* note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill. *See* 2 U.S.C. § 683; *see also Train v. City of New York*, 420 U.S. 35 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.").

## III[2]

We thus far have concluded that the Commission's inaction violates the Nuclear Waste Policy Act. To be sure, there are also two principles rooted in Article II of the Constitution that give the Executive authority, in certain circumstances, to decline to act in the face of a clear statute. But neither of those principles applies here.

*First*, the President possesses significant independent authority to assess the constitutionality of a statute. *See* U.S. CONST. art. II, § 1, cl. 1 (Executive Power Clause); U.S. CONST. art. II, § 1, cl. 8 (Oath of Office Clause); U.S. CONST. art. II, § 3 (Take Care Clause). But that principle does not help the Commission.

To explain: The President is of course not bound by Congress's assessment of the constitutionality of a statute. The Take Care Clause of Article II refers to "Laws," and those Laws include the Constitution, which is superior to statutes. *See* U.S. CONST. art. VI (Constitution is "supreme Law of the Land"). So, too, Congress is not bound by the President's assessment of the constitutionality of a statute. Rather, in a justiciable case, the Supreme Court has the final word on whether a statutory mandate or prohibition on the Executive is constitutional. *See Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) (Presidential Recordings and Materials Preservation Act is constitutional); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 639 (1952) (Jackson, J., concurring) (congressional statutes that together preclude President from seizing steel mills are constitutional); *see generally Marbury v. Madison*, 5 U.S. 137 (1803).

---

[2] Judge Kavanaugh alone joins Part III of the opinion.

So unless and until a final Court decision in a justiciable case says that a statutory mandate or prohibition on the Executive Branch is constitutional, the President (and subordinate executive agencies supervised and directed by the President) may decline to follow that statutory mandate or prohibition if the President concludes that it is unconstitutional. Presidents routinely exercise this power through Presidential directives, executive orders, signing statements, and other forms of Presidential decisions. *See, e.g.*, *Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012) (based on Article II, Presidents Bush and Obama refused to comply with statute regulating passports of individuals born in Jerusalem); *Myers v. United States*, 272 U.S. 52 (1926) (based on Article II, President Wilson refused to comply with statutory limit on the President's removal power); *see also Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 906 (1991) (Scalia, J., concurring) (President has "the power to veto encroaching laws or even to disregard them when they are unconstitutional") (citation omitted); *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. Off. Legal Counsel 199, 199-200 (1994) (Walter Dellinger) (describing as "uncontroversial" and "unassailable" the proposition that a President may decline to execute an unconstitutional statute in some circumstances); 2 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 446 (Jonathan Elliot ed., 2d ed. 1836) ("the President of the United States could shield himself, and refuse to carry into effect an act that *violates* the Constitution") (statement of James Wilson).[3]

---

[3] In declining to follow a statutory *mandate* that the President independently concludes is unconstitutional, the President generally may decline to expend funds on that unconstitutional program, at least unless and until a final Court order rules otherwise. But in

But even assuming arguendo that an independent agency such as the Nuclear Regulatory Commission possesses Article II authority to assess the constitutionality of a statute and thus may decline to follow the statute until a final Court order says otherwise,[4] the Commission has not asserted that the relevant statutes in this case are unconstitutional. So that Article II principle is of no help to the Commission here.

---

declining to follow a statutory *prohibition* that the President independently concludes is unconstitutional (and not just unwise policy, *cf. supra* note 1), the Appropriations Clause acts as a separate limit on the President's power. It is thus doubtful that the President may permissibly expend more funds than Congress has appropriated for the program in question. *See* U.S. CONST. art. I, § 9, cl. 7 (Appropriations Clause); *see also OPM v. Richmond*, 496 U.S. 414, 425 (1990) ("Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."). It is sometimes suggested, however, that the President may elect not to follow a statutory prohibition on how *otherwise available appropriated funds* are spent if the President concludes that the prohibition is unconstitutional, at least unless and until a final Court order rules otherwise. *See* David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb – Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 740 (2008). This case does not require analysis of those difficult questions.

[4] It is doubtful that an independent agency may disregard a statute on constitutional grounds unless the President has concluded that the relevant statute is unconstitutional. But we need not delve further into that question here. *Compare Humphrey's Executor v. United States*, 295 U.S. 602 (1935), *with Myers*, 272 U.S. 52, *and Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010).

*Second*, it is also true that, under Article II, the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against violators of a federal law. But that principle does not support the Commission's inaction here. To demonstrate why, the contours of the Executive's prosecutorial discretion must be explained.

The Presidential power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause. *See* U.S. CONST. art. II, § 1, cl. 1 (Executive Power Clause); U.S. CONST. art. II, § 1, cl. 8 (Oath of Office Clause); U.S. CONST. art. II, § 2, cl. 1 (Pardon Clause); U.S. CONST. art. II, § 3 (Take Care Clause); *see also* U.S. CONST. art. I, § 9, cl. 3 (Bill of Attainder Clause). The President may decline to prosecute certain violators of federal law just as the President may pardon certain violators of federal law.[5] The President may decline to prosecute or may pardon because of the President's own constitutional concerns about a law *or* because of policy objections to the law, among other reasons.[6] *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate,

---

[5] The power to pardon encompasses the power to commute sentences. *See Schick v. Reed*, 419 U.S. 256, 264 (1974).

[6] One important difference between a decision not to prosecute and a pardon is that a pardon prevents a future President from prosecuting the offender for that offense. Prosecutorial discretion, meanwhile, might be exercised differently by a future President – subject to statute of limitations issues or any due process limits that might apply when an offender has reasonably relied on a prior Presidential promise not to prosecute particular conduct.

and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws . . . ."); *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) ("The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause."); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. Off. Legal Counsel 101, 125 (1984) (Theodore B. Olson) ("the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law"); *id.* at 115 ("The Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals."); Congressman John Marshall, Speech to the House of Representatives (1800), *reprinted in* 18 U.S. app. at 29 (1820) (The President may "direct that the criminal be prosecuted no further. This is . . . the exercise of an indubitable and a constitutional power."); *see also United States v. Klein*, 80 U.S. 128, 147 (1871) ("To the executive alone is intrusted the power of pardon; and it is granted without limit.").

In light of the President's Article II prosecutorial discretion, Congress may not *mandate* that the President prosecute a certain kind of offense or offender. The logic behind the pardon power further supports that conclusion. As has been settled since the Founding, the President has absolute authority to issue a pardon at any time after an unlawful act has occurred, even *before* a charge or trial. *See Ex parte Grossman*, 267 U.S. 87, 120 (1925) ("The Executive

can reprieve or pardon all offenses after their commission, either before trial, during trial or after trial, by individuals, or by classes . . . ."). So it would make little sense to think that Congress constitutionally could compel the President to prosecute certain offenses or offenders, given that the President has undisputed authority to pardon all such offenders at any time after commission of the offense. *See* AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 179 (2005) ("greater power to pardon subsumed the lesser power to simply decline prosecution").[7]

The Executive's broad prosecutorial discretion and pardon powers illustrate a key point of the Constitution's separation of powers. One of the greatest *unilateral* powers a President possesses under the Constitution, at least in the domestic sphere, is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior – more precisely, the power either not to seek charges against violators of a federal law or to pardon violators of a federal law.[8] The Framers saw the separation of the power to prosecute from the power to legislate as essential

---

[7] If the Executive selectively prosecutes someone based on impermissible considerations, the equal protection remedy is to dismiss the prosecution, not to compel the Executive to bring another prosecution. *See United States v. Armstrong*, 517 U.S. 456, 459, 463 (1996); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); *cf. Linda R.S. v. Richard D.*, 410 U.S. 614, 618-19 (1973).

[8] Congress obviously has tools to deter the Executive from exercising authority in this way – for example by using the appropriations power or the advice and consent power to thwart other aspects of the Executive's agenda (and ultimately, of course, Congress has the impeachment power). But Congress may not overturn a pardon or direct that the Executive prosecute a particular individual or class of individuals.

to preserving individual liberty. *See* THE FEDERALIST NO. 47, at 269 (James Madison) (Clinton Rossiter ed., rev. ed. 1999) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny."); 1 MONTESQUIEU, THE SPIRIT OF LAWS bk. 11, ch. 6, at 163 (Thomas Nugent trans., 1914) ("When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."). After enacting a statute, Congress may not mandate the prosecution of violators of that statute. Instead, the President's prosecutorial discretion and pardon powers operate as an independent protection for individual citizens against the enforcement of oppressive laws that Congress may have passed (and still further protection comes from later review by an independent jury and Judiciary in those prosecutions brought by the Executive).[9]

---

[9] It is likely that the Executive may decline to seek *civil* penalties or sanctions (including penalties or sanctions in administrative proceedings) on behalf of the Federal Government in the same way. Because they are to some extent analogous to criminal prosecution decisions and stem from similar Article II roots, such civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power. *See Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'") (quoting U.S. CONST. art. II, § 3); *Heckler v. Chaney*, 470 U.S. 821, 831-33 (1985); *Confiscation Cases*, 74 U.S. 454, 457 (1868); *see*

To be sure, a President's decision to exercise prosecutorial discretion and to decline to seek charges against violators (or to pardon violators) of certain laws can be very controversial. For example, if a President disagreed on constitutional or policy grounds with certain federal marijuana or gun possession laws and said that the Executive Branch would not initiate criminal charges against violators of those laws, controversy might well ensue, including public criticism that the President was "ignoring" or "failing to enforce" the law (and if a court had previously upheld the law in question as constitutional, additional claims that the President was also "ignoring" the courts). But the President has clear constitutional authority to exercise prosecutorial discretion to decline to prosecute violators of such laws, just as the President indisputably has clear constitutional authority to pardon violators of such laws. *See, e.g.*, 1963 Attorney Gen. Ann. Rep. 62, 62-63 (1963) (President Kennedy commuted the sentences of many drug offenders sentenced to mandatory minimums); Letter from Thomas Jefferson to Abigail Adams (July 22, 1804), *in* 11 THE WRITINGS OF THOMAS JEFFERSON 42, 43-44 (Andrew A. Lipscomb & Albert Ellery Bergh eds., 1904) (President Jefferson both pardoned those convicted under the Sedition Act and refused to prosecute violators of the Act); President George

---

*also Butz v. Economou*, 438 U.S. 478, 515 (1978); *Seven-Sky v. Holder*, 661 F.3d 1, 50 & n.43 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (referring to possibility that a President might exercise prosecutorial discretion not to seek civil penalties against violators of a statute). That said, it has occasionally been posited that the President's power not to initiate a civil enforcement action may not be entirely absolute (unlike with respect to criminal prosecution) and thus might yield if Congress expressly mandates civil enforcement actions in certain circumstances. *Cf. Heckler*, 470 U.S. at 832-33.

18

Washington, Proclamation (July 10, 1795), in 1 A
COMPILATION OF THE MESSAGES AND PAPERS OF THE
PRESIDENTS 1789-1897, at 181 (James D. Richardson ed.,
1896) (President Washington pardoned participants in the
Pennsylvania Whiskey Rebellion).[10]      The remedy for

---

[10] As a general matter, there is widespread confusion about the
differences between (i) the President's authority to disregard
statutory mandates or prohibitions on the Executive, based on the
President's constitutional objections, and (ii) the President's
prosecutorial discretion not to initiate charges against (or to pardon)
violators of a federal law.  There are two key practical differences.
*First*, the President may disregard a statutory mandate or
prohibition on the Executive only on constitutional grounds, not on
policy grounds.   By contrast, the President may exercise the
prosecutorial discretion and pardon powers on any ground –
whether based on the Constitution, policy, or other considerations.
*Second*, our constitutional structure and tradition establish that a
President is bound to comply with a final Court decision holding
that a statutory mandate or prohibition on the Executive is
constitutional.   But in the prosecutorial discretion and pardon
context, when a Court upholds a statute that regulates private
parties as consistent with the Constitution, that ruling simply
*authorizes* prosecution of violators of that law.  Such a Court ruling
does not *require* the President either to prosecute violators of that
law or to refrain from pardoning violators of that law.  So the
President may decline to prosecute or may pardon violators of a law
that the Court has upheld as constitutional.  To take one example, a
President plainly could choose not to seek (or could commute)
federal death sentences because of the President's own objections
to the death penalty, even though the Supreme Court has upheld the
death penalty as constitutional.  *See* Daniel J. Meltzer, *Executive
Defense of Congressional Acts*, 61 DUKE L.J. 1183, 1189-90 (2012)
("President Jefferson ended pending prosecutions under the
Sedition Act and pardoned individuals previously convicted under
that Act, even though the courts had upheld the Act's
constitutionality. . . . [I]t can hardly be said that his pardons

Presidential abuses of the power to pardon or to decline to prosecute comes in the form of public disapproval, congressional "retaliation" on other matters, or ultimately impeachment in cases of extreme abuse.

So having said all of that, why doesn't the principle of prosecutorial discretion justify the Nuclear Regulatory Commission's inaction in this case? The answer is straightforward. Prosecutorial discretion encompasses the Executive's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law. Prosecutorial discretion does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to issue rules, *see Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007) (explaining the difference), or to pay benefits, or to implement or administer statutory projects or programs. Put another way, prosecutorial discretion encompasses the discretion not to *enforce* a law against private parties; it does not encompass the discretion not to *follow* a law imposing a mandate or prohibition on the Executive Branch.[11]

_____

disregarded a duty to enforce or defend a congressional statute, given that the pardon power, by its nature, involves undoing the prior enforcement, via conviction, of a statute. And although the abatement of pending prosecutions failed in one sense to enforce the Sedition Act, given the breadth of prosecutorial discretion – whether rooted in the Constitution, in the presumed intention of Congress, or in some combination of the two – it is hard to view Jefferson as having disregarded a congressional mandate.") (footnotes omitted).

[11] Of course, for reasons already discussed, the President may decline to follow a law that purports to *require* the Executive

This case does not involve a Commission decision not to prosecute violations of federal law. Rather, this case involves a Commission decision not to follow a law mandating that the Commission take certain non-prosecutorial action. So the Executive's power of prosecutorial discretion provides no support for the Commission's inaction and disregard of federal law here.

## IV

At the behest of the Commission, we have repeatedly gone out of our way over the last several years to defer a mandamus order against the Commission and thereby give Congress time to pass new legislation that would clarify this matter if it so wished. In our decision in August 2012, the Court's majority made clear, however, that mandamus likely would have to be granted at some point if Congress took no further action. *See* Order, *In re Aiken County*, No. 11-1271 (D.C. Cir. Aug. 3, 2012). Since then, Congress has taken no further action on this matter. At this point, the Commission is simply defying a law enacted by Congress, and the Commission is doing so without any legal basis.

We therefore have no good choice but to grant the petition for a writ of mandamus against the Commission.[12]

_____

Branch to prosecute certain offenses or offenders. Such a law would interfere with the President's Article II prosecutorial discretion.

[12] In his dissent, Chief Judge Garland cites several cases to explain his vote against granting mandamus in this case. Of the eight cases he cites, however, five did not involve a statutory mandate with a defined deadline, as we have here. In the other three cases, the Court made clear that either the agency had to act or the Court would grant mandamus in the future. *See In re United*

This case has serious implications for our constitutional structure. It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law in the manner asserted in this case by

---

*Mine Workers of America International Union*, 190 F.3d 545, 554 (D.C. Cir. 1999) ("however modest [an agency's] personnel and budgetary resources may be, there is a limit to how long it may use these justifications to excuse inaction"); *Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 477 (D.C. Cir. 1998) (denying mandamus partly because "this is not a case where an agency has been contumacious in ignoring court directions to expedite decision-making"); *In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (mandamus inappropriate where it would interfere with agency priorities set by applying agency expertise but noting that "[w]here the agency has manifested bad faith, as by . . . asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities"). Consistent with those precedents, we followed a cautious approach in our decision more than a year ago when we declined to issue mandamus against the Commission at that time. But the Court's majority clearly warned that mandamus would eventually have to be granted if the Commission did not act or if Congress did not change the law. Since then, despite the clear warning, the Commission has still not complied with the statutory mandate. On the contrary, the Commission has reaffirmed that it has no plans to comply with the statutory mandate. In the face of such deliberate and continued agency disregard of a statutory mandate, our precedents strongly support a writ of mandamus. Our respectful factbound difference with Chief Judge Garland, then, is simply that we believe – especially given the Court's cautious and incremental approach in prior iterations of this litigation, the significant amount of money available for the Commission to continue the licensing process, and the Commission's continued disregard of the law – that the case has by now proceeded to the point where mandamus appropriately must be granted.

the Nuclear Regulatory Commission. Our decision today rests on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress in the circumstances here. To be sure, if Congress determines in the wake of our decision that it will never fund the Commission's licensing process to completion, we would certainly hope that Congress would step in before the current $11.1 million is expended, so as to avoid wasting that taxpayer money. And Congress, of course, is under no obligation to appropriate additional money for the Yucca Mountain project. Moreover, our decision here does not pre-judge the merits of the Commission's consideration or decision on the Department of Energy's license application, or the Commission's consideration or decision on any Department of Energy attempt to withdraw the license application. But unless and until Congress authoritatively says otherwise or there are no appropriated funds remaining, the Nuclear Regulatory Commission must promptly continue with the legally mandated licensing process. The petition for a writ of mandamus is granted.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring: I join all of the majority opinion except part III, which I believe is unnecessary to decide the case.

I also believe some background information is needed to understand what has occurred here. The Nuclear Waste Policy Act states that the Commission "shall consider" the Yucca Mountain license application and "shall issue a final decision approving or disapproving" the application "not later than" three years after its submission. 42 U.S.C. § 10134(d). The Department of Energy filed the Yucca Mountain application in June 2008, *see* Yucca Mountain; Notice of Receipt and Availability of Application, 73 Fed. Reg. 34,348 (June 17, 2008), and Congress later provided substantial appropriations for the licensing process, *see* U.S. NUCLEAR REGULATORY COMMISSION, NUREG-1100, VOL. 26, CONGRESSIONAL BUDGET JUSTIFICATION FOR FY 2011 94–95 (2010). Although the Commission had a duty to act on the application and the means to fulfill that duty, former Chairman Gregory Jaczko orchestrated a systematic campaign of noncompliance. Jaczko unilaterally ordered Commission staff to terminate the review process in October 2010; instructed staff to remove key findings from reports evaluating the Yucca Mountain site; and ignored the will of his fellow Commissioners. *See* U.S. NUCLEAR REGULATORY COMMISSION, OFFICE OF THE INSPECTOR GENERAL, OIG CASE NO. 11-05, NRC CHAIRMAN'S UNILATERAL DECISION TO TERMINATE NRC'S REVIEW OF DOE YUCCA MOUNTAIN REPOSITORY LICENSE APPLICATION 7–10, 17, 44–46 (2011). These transgressions prompted an investigation by the Commission's Inspector General, as well as a letter from all four of the Commission's other members expressing "grave concerns" about Jaczko's performance in office. *See* Matthew Daly, *Nuclear Agency's Commissioners and Chief Trade War of Words*, WASH. POST, Dec. 10, 2011, at A18. After we heard oral argument in this case, Jaczko resigned.

Today's judgment should ensure that the Commission's next chapter begins with adherence to the law. In the Nuclear Waste Policy Act Congress required the Commission to rule on the Yucca Mountain application, and it appropriated funds for that purpose. The Commission's duty is to comply with the law and our duty is to make sure it does so. "Once Congress . . . has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *TVA v. Hill*, 437 U.S. 153, 194 (1978).

GARLAND, *Chief Judge*, dissenting: Mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (internal quotation marks omitted). Even if a petitioner can show that it has a "clear and indisputable" right to the writ, issuing the writ remains "a matter vested in the discretion of the court." *Id.* at 381, 391. Likewise, "mandamus[] does not necessarily follow a finding of a [statutory] violation." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (second alteration in original) (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991)). To the contrary, this court has not hesitated to deny the writ even when an agency has missed a statutory deadline by far more than the two years that have passed in this case. *See id.* at 546, 551 (declining to issue the writ, notwithstanding that the agency missed an "express" statutory deadline by 8 years in "clear violation" of the statute).[1] Finally, and most relevant

---

[1]*See also, e.g.*, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 850 (D.C. Cir. 2008) (noting that the court had declined to issue the writ after the agency failed to respond to the court's remand for 3 years, but issuing the writ when the delay reached 6 years); *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100-01 (D.C. Cir. 2003) (vacating and remanding the district court's determination that a 5-year delay was unreasonable, due to the district court's failure to consider the agency's resource constraints); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477-78 (D.C. Cir. 1998) (declining to order agency action notwithstanding a 10-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1146-47, 1150 (D.C. Cir. 1992) (noting that the court had declined to issue the writ after a 3-year delay, but issuing the writ when the delay reached 6 years); *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 945-47 (D.C. Cir. 1988) (declining to issue the writ despite the agency's 3-year delay since the ALJ's initial decision, and 5-year delay since the start of agency proceedings); *Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d 1480, 1487-88 (D.C. Cir. 1985) (declining to issue the writ after a 5-year delay).

here, "[c]ourts will not issue the writ to do a useless thing, even though technically to uphold a legal right." *United States ex rel. Sierra Land & Water Co. v. Ickes*, 84 F.2d 228, 232 (D.C. Cir. 1936).[2]

Unfortunately, granting the writ in this case will indeed direct the Nuclear Regulatory Commission to do "a useless thing." The NRC has not refused to proceed with the Yucca Mountain application. Rather, by unanimous votes of both the Commission and its Atomic Safety and Licensing Board, it has suspended the application proceeding until there are sufficient funds to make meaningful progress. *See* Mem. and Order at 1-2 (N.R.C. Sept. 9, 2011); Mem. and Order (Suspending Adjudicatory Proceeding) at 3 (A.S.L.B. Sept. 30, 2011); NRC Br. 53; NRC Resp. Br. 5; Oral Arg. Tr. 36. Five months prior to that suspension, Congress had given the Commission only the minimal amount it requested to "support work related to the orderly closure of the agency's Yucca Mountain licensing support activities." NRC, CONG. BUDGET JUSTIFICATION FOR FY 2011, at 95 (2010); *see* Full-Year Continuing Appropriations Act, 2011, Pub. L. No. 112-10, § 1423, 125 Stat. 38, 126 (2011). The following year, Congress completely zeroed out the Commission's funding for the project. And the year following that -- after we held this case in abeyance so that Congress could indicate whether it intended to fund the project going forward, *see* Order, *In re Aiken County*, No. 11-1271 (D.C. Cir. Aug. 3, 2012) -- Congress once again appropriated no money for Yucca Mountain activities.

---

[2]*See Weber v. United States*, 209 F.3d 756, 760 (D.C. Cir. 2000) (declaring that the writ "is not to be granted in order to command a gesture"); *Realty Income Trust v. Eckerd*, 564 F.2d 447, 458 (D.C. Cir. 1977) (holding that "equity should not require the doing of a 'vain or useless thing'").

As a consequence, the agency has only about $11 million left in available funds. No one disputes that $11 million is wholly insufficient to complete the processing of the application. By way of comparison, the Commission's budget request for the most recent year in which it still expected the Yucca Mountain proceeding to move forward was $99.1 million. *See* Inspector Gen. Mem. at 8 (June 6, 2011) (describing NRC's FY 2010 performance budget request, which Congress did not grant).[3] The only real question, then, is whether the

---

[3]To put the size of the application process in concrete terms, at the time the NRC suspended its licensing proceeding, 288 contentions -- claims that must be resolved before the application can be granted -- remained outstanding. *See* Mem. and Order (Suspending Adjudicatory Proceeding) at 3 (A.S.L.B. Sept. 30, 2011); *see also* Mem. and Order at 2 (N.R.C. June 30, 2009) (noting that the Yucca Mountain proceeding "is the most extensive . . . in the agency's history"). Over 100 expert witnesses had been identified for depositions, to address contentions on such diverse subjects as hydrology, geochemistry, climate change, corrosion, radiation, volcanism, and waste transport -- and those were just for the first phase of the proceeding. *See* Mem. and Order (Identifying Participants and Admitted Contentions), Attachment A at 1-10 (A.S.L.B. May 11, 2009); Dep't of Energy Mot. to Renew Temporary Suspension ("DOE Mot.") at 5 n.14 (A.S.L.B. Jan. 21, 2011).

Nor is funding for the NRC the only problem. The Department of Energy (DOE) is the license applicant and an indispensable party in the application process; it bears the burden of proof on each of the remaining 288 contentions. *See* 10 C.F.R. § 2.325. But Congress has zeroed out DOE's Yucca Mountain funding for three years running. It, too, has only a comparatively small amount of carryover funds available -- enough for less than two months' participation. *See* U.S. Amicus Br. 6; *see also infra* note 4.

Of course, processing the application is itself only the tip of the iceberg. Completing the project, including constructing the Yucca

Commission can make any meaningful progress with $11 million.

The Commission has concluded that it cannot. *See* NRC Resp. Br. 5; U.S. Amicus Br. 9; *see also* NRC Br. 42. And we are not in a position -- nor do we have any basis -- to second-guess that conclusion. Two years ago, citing insufficient funds to proceed and the need to preserve the materials it had collected, the NRC shuttered the licensing program, dismantled the computer system upon which it depended, shipped the documents to storage, and reassigned the program's personnel to projects that did have congressional funding. *See* Mem. and Order at 1-2 (N.R.C. Sept. 9, 2011); NRC Br. 3; Pet'rs Br. 16; Oral Arg. Tr. 45. The Commission believes it will take a significant part of the $11 million to get the process started again. *See* Oral Arg. Tr. 45-49; *see also* U.S. Amicus Br. 6.[4] Nor would that leave the Commission with the remainder to spend on moving the application along, however slightly. In light of the NRC's previous three years of appropriations experience, the only responsible use for the remaining money would be to spend it on putting the materials back into storage -- in order to preserve them for the day (if it ever arrives) that Congress provides additional funds. *See* Oral Arg. Tr. 48-49.

---

Mountain facilities themselves, would require another $50 billion, none of which has been appropriated. *See* Oral Arg. Tr. 63.

[4]The Department of Energy is in a position similar to that of the NRC. The DOE office with responsibility for the Yucca Mountain project ceased operations in September 2010. *See* DOE Mot. at 4-5. "An active licensing proceeding would thus require DOE to, among other things, re-hire employees, enter into new contracts for necessary services, and re-create capabilities . . . ." *Id.* at 5; *see also supra* note 3.

In short, given the limited funds that remain available, issuing a writ of mandamus amounts to little more than ordering the Commission to spend part of those funds unpacking its boxes, and the remainder packing them up again. This exercise will do nothing to safeguard the separation of powers, which my colleagues see as imperiled by the NRC's conduct. *See* Court Op. at 7, 21-22. And because "[i]t is within our discretion not to order the doing of a useless act," *Sierra Land & Water*, 84 F.2d at 232, I respectfully dissent.[5]

---

[5]*Cf. In re Barr Labs.*, 930 F.2d at 76 ("Congress sought to get generic drugs into the hands of patients at reasonable prices -- fast. The record before us reflects a defeat of those hopes. There are probably remedies[, including] more resources. . . . [N]one is within our power, and a grant of [the] petition [for mandamus] is no remedy at all.").